# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-84V**
**Filed: May 21, 2024**

|  |  |
|---|---|
| JUSTIN BURROUGHS,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Special Master Horner |

*John Robert Howie, Jr., Howie Law, P.C., Dallas, TX, for petitioner.*
*Katherine Carr Esposito, U.S. Department of Justice, Washington, DC, for respondent.*

## RULING ON ENTITLEMENT[1]

On January 5, 2021, petitioner, Justin Burroughs, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012),[2] alleging that he suffered a Shoulder Injury Related to Vaccine Administration ("SIRVA"), a Table Injury, resulting from adverse effects of a tetanus, diphtheria and acellular pertussis ("Tdap") vaccine he received on December 23, 2019.  (ECF No. 1.)  On December 7, 2022, he filed an amended petition adding an alternative cause-in-fact claim.  (ECF No. 30.)  For the reasons set forth below, I conclude that petitioner is entitled to compensation for a Table SIRVA.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the document will be available to anyone with access to the internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

## I.     Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury.  Finally – and the key question in most cases under the Program – the petitioner must also establish a causal link between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1)(A); § 300 aa-11(c)(1)(C)(i); § 300aa-14(a); § 300aa-13(a)(1)(B).

As relevant here, the Vaccine Injury Table lists a Shoulder Injury Related to Vaccine Administration or "SIRVA" as a compensable injury if it occurs within 48 hours of vaccine administration.  § 300aa-14(a) as amended by 42 CFR § 100.3.  Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAIs"), which provide more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table.  42 CFR § 100.3(c).  To be considered a "Table SIRVA," petitioner must show that his injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.).  SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;

2

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 CFR § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii).  To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury."  *Moberly ex rel. Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006).  In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact.  *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non–Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence".  § 300aa-13(a).  That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence . . . ."  *Moberly*, 592 F.3d at 1322 n.2.  Proof of medical certainty is not required.  *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991).  However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician.  § 300aa-11(c)(1).  Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination.  *Althen,* 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

In this case, petitioner stresses that he suffered an injury consistent with a SIRVA Table Injury.  Alternatively, petitioner asserts that the evidence supports a non-Table shoulder injury caused-in-fact by his vaccination.  (ECF No. 32, 50.)

## II.   Procedural History

After filing his petition, petitioner filed medical records and a sworn statement. (ECF Nos. 10-11; Exs. 1-11.)  He filed his Statement of Completion on May 25, 2021. (ECF No. 14.)  Initially, this case was assigned to the Chief Special Master as part of the Special Processing Unit ("SPU") based on the allegations in the petition.  (ECF No. 17-18.)

Before respondent had completed his medical review of the case, petitioner filed a motion for a finding of fact regarding the site and route of administration of the vaccination at issue.  (ECF No. 28.)  Along with his motion, petitioner filed medical literature marked as Exhibits 12-17.  (ECF No. 27.)  However, respondent subsequently filed his Rule 4(c) Report rather than a motion response.  (ECF No. 29.)  Respondent disputed that petitioner had shown his alleged injury had persisted for at least six months and further disputed that he had demonstrated either a Table Injury or causation-in-fact; however, he did not raise any argument with respect to the site or route of administration of petitioner's vaccination.  (*Id.*)

On December 7, 2022, petitioner filed a motion for a ruling on the written record urging his entitlement to compensation.  (ECF No. 32.)  Along with his motion, he filed the curriculum vitae of one of his treating physicians – Dr. Marko Bodor – along with additional medical literature.  (ECF No. 31; Exs. 18-22.)  Dr. Bodor has served as an expert in prior SIRVA cases.

Respondent moved for a stay of his response deadline, arguing that petitioner should file an expert report (ECF No. 33); however, the Chief Special Master denied the motion and required respondent to file a response to the motion (ECF No. 35.)  On March 6, 2023, respondent filed his response to petitioner's motion along with an expert report by orthopedist Julie Bishop, M.D.  (ECF Nos. 38-39; Exs. A-B.)  Respondent also filed medical literature marked as Exhibits B1-B7.  (ECF No. 40.)

Petitioner then filed his reply brief and a motion to exclude Dr. Bishop's report on April 5, 2023.  (ECF No. 42.)   He additionally filed further literature marked as Exhibits 23-30 and a motion to exclude Dr. Bishop's report.  (ECF Nos. 41.)

The case was reassigned to the undersigned on April 26, 2023, with all three of petitioner's motions pending.  (ECF No. 28, 43-44.)  I then issued a Rule 5 Order, wherein I denied petitioner's motion to exclude Dr. Bishop's report.  (ECF No. 45, p. 2.)  I provided the parties with preliminary guidance relating to the Vaccine Act's severity requirement, the fourth SIRVA QAI criterion, and petitioner's alternative cause-in-fact claim.  (*Id.* at 2-4.)  I advised that I would provided petitioner an opportunity to respond to Dr. Bishop's report, but that I otherwise felt petitioner's motion for a ruling on the record was ripe and that it would be appropriate to resolve entitlement based on that motion practice.  (*Id.* at 4.)

Petitioner then filed an expert report by Dr. Bodor with supporting literature.  (ECF No. 47; Exs. 31-38.)  He filed a supplemental motion for a ruling on the record on September 25, 2023.  (ECF No. 50.)  Respondent filed a response on October 23, 2023, and petitioner filed a reply on November 6, 2023.  (ECF Nos. 51-52.)

In light of the above I have determined that the parties have had a full and fair opportunity to present their cases and that it is appropriate to resolve this issue without a hearing.  *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters

must determine that the record is comprehensive and fully developed before ruling on the record").  Accordingly, this matter is now ripe for resolution.

### III.   Factual History

#### a.  Medical Records

On December 23, 2019, petitioner presented to urgent care with a history of a cut on his left ring finger one week prior.  (Ex. 3, p. 3.)  He was diagnosed with cellulitis and prescribed an antibiotic ointment.  (*Id*.)  He was administered a Tdap vaccination in his left shoulder.[3]  (*Id*. at 4.)  The next day, he complained by telephone of diaphoresis, nausea, and migraine.  (*Id*. at 5.)  His antibiotic prescription was therefore changed.  (*Id*.)

On January 3, 2020, eleven days post-vaccination, petitioner presented to his primary care provider.  (Ex. 6, pp. 12-13.)  He complained of left shoulder pain "x 10 days since the Tdap vaccine admin."  (*Id*. at 12.)  Petitioner reported that his Tdap vaccine had been administered too high up on his left arm and he was concerned it may have caused "SIRVA."  (*Id*.)  His pain was noted to be "aching" and "dull."  (*Id*.)  He was diagnosed with stable left shoulder pain and prescribed Meloxicam (an NSAID), Carisoprodol (a muscle relaxant), and a Medrol Dosepak (a steroid).  (*Id*. at 13.)  An x-ray was ordered, and he was instructed to follow up in two weeks.  (*Id*.)  The x-rays were completed on January 21, 2020, and did not identify any abnormalities.  (*Id*. at 14.)

On February 26, 2020, petitioner had an initial evaluation with an orthopedist Stephen Yacoubian, M.D.[4]  (Ex. 7, p. 3.)  He reported "pain in the shoulder [that] started with a tetanus shot, which was administered to his left shoulder on 12/26/2019 [*sic*.] in

---

[3] The documentation of petitioner's Tdap vaccine as generated by the urgent care (a consent form only) does not confirm petitioner's vaccination to have been administered in his left shoulder or that the vaccine was intramuscular.  (Ex. 2, Ex. 3, p. 4.)  Petitioner filed a motion for a finding of fact on these points, stressing that his subsequent medical treatment records consistently attribute his left shoulder pain to his documented Tdap vaccination.  (ECF No. 28.)  As discussed in the procedural history above, respondent never filed a response to this motion and did not raise any issue as to the site or route of administration of the subject vaccination in his Rule 4 Report.  In any event, I agree with petitioner that on this record the subsequent treatment records (and in particular Ex. 6, p. 12; Ex. 7, p. 3) are sufficient to evidence a left shoulder administration.  *Accord Hanna v. Sec'y of Health & Human Servs*., No. 18-1455V, 2021 WL 3486248, at *9 (Fed. Cl. Spec. Mstr. July 15, 2021) (discussing prior cases supporting the proposition that a consistent pattern of attribution of a shoulder injury to vaccination within treatment records is probative evidence regarding the site of injection).  Therefore, petitioner's unopposed motion for a finding of fact that petitioner's vaccination was administered intramuscularly in his left shoulder is GRANTED.

[4] In the interim, petitioner had an appointment with another internist on January 28, 2020.  (Ex. 5, pp. 46-47.)  However, the medical records reflect that over the course of four years petitioner only ever saw this doctor with respect to his ADHD.  (Ex. 5, *passim*.)  Petitioner's shoulder condition was never discussed with this doctor.  (*Id*.)  Petitioner also had an encounter with this doctor on March 24, 2020.  (Ex. 5, pp. 48-49.)

Florida . . . The left shoulder has been hurting since."[5]  (*Id*.)  Pain was noted to be 8 out of 10, worse with function and overhead function, and also with weakness and stiffness. (*Id*.)  Physical exam was positive for impingement, crepitus, and pain with abduction and external rotation.  (*Id*. at 4.)  Weakness was noted, but O'Brien's, Hawking, Speed's, and Spurling tests were negative.  (*Id*.)  Petitioner had no acromioclavicular joint tenderness and no scapular winging.  (*Id*.)  The assessment was "[l]eft shoulder strain injury, possible injection related injury."  (*Id*.)  An MRI was ordered.  (*Id*. at 5.)

Petitioner had a left shoulder MRI on March 1, 2020.  (Ex. 7, p. 7.)  The MRI findings were as follows:

- "[A] focus of 1x2 cm marrow contusion in posterior lateral aspect of the humeral head" and "a subtle cortical deformity."  (*Id*. at 8.)  This was noted to be "worrisome for a Hill-Sachs deformity" for which clinical correlation was recommended.  (*Id*.)  There were also "numerous subchondral degenerative cystic changes in the anterior aspect of the glenoid with marked loss of cartilage." (*Id*.)

- "A low-grade partial articular surface tear of the supraspinatus tendon."  (*Id*.)

- "Abnormal increased signal intensity is noted in the superior and anterior labrum consistent with a SLAP type II lesion."  (*Id*.)

- "[N]o evidence of subacromial or subdeltoid bursal fluid collection."  (*Id*.)

- "[M]ild acromioclavicular joint degenerative changes" and a "[m]ild to moderate amount of joint effusion."  (*Id*.)

Petitioner followed up with Dr. Yacoubian on March 18, 2020, to discuss the MRI results.  (Ex. 7, p. 11.) (This record incorrectly indicates the appointment was relative to the right shoulder.)  Regarding the post-vaccination onset of symptoms, Dr. Yacoubian indicated that "I told the patient that I do not see any lesions or any damage in the deltoid region where I presume the shot may have been given.  It is conceivable that the shot did go into the subacromial space inadvertently and may have contributed to rotator cuff issues."  (*Id*.)  Physical exam showed mild impingement, clicking, and weakness, and petitioner was diagnosed with "[r]otator cuff partial tear, SLAP tear, impingement, and history of tetanus injection with lateral pain right [*sic*.] shoulder."  (*Id*. at 12.)  Physical therapy was ordered.  (*Id*.)

Petitioner presented for physical therapy on May 13, 2020.  (Ex. 9, p. 2.) Petitioner gave a history consistent with the above.  (*Id*.)  It was noted that he had an active lifestyle prior to his injury, with reported activities including weightlifting, climbing, swimming, and volleyball.  (*Id*. at 2, 4.)  Upon evaluation, petitioner had impaired flexion, abduction, external rotation, and internal rotation.  (*Id*. at 3.)  The assessment was that

[5] Petitioner also reported having "some kind of an allergic reaction to the tetanus shot" (Ex. 7, p. 3), which presumably refers to his above-referenced telephone encounter of December 24, 2019 (Ex. 3, p. 5.).

petitioner was presenting to physical therapy "with signs/symptoms of L RCRSP [presumably, rotator cuff related shoulder pain] secondary to getting a tetanus shot in Dec 2019 for a finger injury." (*Id*. at 4.)  It was noted that petitioner had a good rehab potential and six weeks of twice weekly physical therapy was recommended.  (*Id*.)

Petitioner continued physical therapy through June 2, 2020. (Ex. 9, p. 14.) During the course of his physical therapy, the therapist "discussed biopsychosocial contributing factors to pain, discussed reasoning why it is unlikely that vaccine caused imaging findings, [and] validated Pt feelings that the vaccine caused his pain." (*Id*. at 13.)  He was discharged on June 24, 2020, after multiple no shows. (*Id*. at 16.)  At the time of his last physical therapy session, he was still symptomatic.[6] (*Id*. at 14.) Thereafter, there is a seven-month gap in petitioner's medical records from any provider for any medical problem.

On January 10, 2021, petitioner had an initial evaluation with a psychiatrist. (Ex. 10, pp. 2-3.)  In pertinent part, the history indicated:

> Pt is a 29 yo male with no psychiatric history.  He presents with anxiety and depression symptoms secondary to something he went through around a year ago.  In December 2019, he cut himself while cooking, and tried to self-treat it, and got infected.  Over the holidays, he saw someone in urgent care and he got it treated and got a tetanus shot.  He had some reaction where he felt really awful, had lots of pain, etc.  He later had significant problems, and had to see his PCP and then a shoulder specialist, and they found that the tetanus shot was injected into the wrong place, and it caused [*sic*.] his rotator cuff to the point it got inflamed and torn.  The doctor he saw was ignoring/not acknowledging that it was caused by the shot.  He has gone through a lot, and is now going to see a lawyer and look into what he went through/his situation[] [t]hrough this whole year.  He has not gotten treatment/surgery.  There was a lot of "spin" in that they kept ignoring the issue.

(*Id*. at 2.)  The psychiatrist noted a differential diagnosis between anxiety not otherwise specified or posttraumatic stress disorder.  (*Id*. at 3.)  The encounter purported to include a musculoskeletal exam that was normal; however, it was a telehealth encounter and there is no specific mention of petitioner's upper extremities.  (*Id*. at 2-3.)

Shortly thereafter, petitioner reported to Marko Bodor, M.D., on January 21, 2021.  (Ex. 11, p. 3.)  Petitioner provided a history consistent with the above and it was further noted that the "pain remains, feels deeper in the shoulder.  He has no history of injury, but played football . . ."  (*Id*.)  Physical exam documented "full active range of

---

[6] Specifically, the patient comments indicate "[s]houlder has been feeling about the same."  (Ex. 9, p. 14.) In that regard, his prior encounter had indicated "[s]hld continues to bother him . . . Today, shoulder is feeling about the same where it bothers him when he uses it, but doesn't bother him when at rest."  (*Id*. at 12.)  The day before his final physical therapy appointment, petitioner's shoulder was "bothering him more than usual."  (*Id*. at 14.)  However, as of the day of the final encounter, he felt he was back to "just above baseline."  (*Id*.)

motion of the left shoulder, but has pain with greater than 100 degrees abduction, 120 degrees forward flexion, 80 degrees external rotation.  Has positive Hawkins and negative scarf sign.  He can internally rotate up to the thoracic level." (*Id*.)  Dr. Bodor reviewed petitioner's prior March 1, 2020, MRI report.  (*Id*.)  He assessed a "suspected left SIRVA" and planned to have petitioner return for a "Tenex procedure." (*Id*. at 4.)

On March 4, 2021, petitioner returned to Dr. Bodor for a diagnostic ultrasound and ultrasound guided teres minor tendon anesthetic injection.  (Ex. 11, p. 5.)  At this time, petitioner reported for the first time that he had also been experiencing tingling down his forearm and to his fingertips.  (*Id*. at 6.)  On ultrasound, petitioner's biceps tendon, subscapularis, rotator interval, and anterior leading edge of the supraspinatus were all noted to be intact.  (*Id*. at 5.)  He had no other rotator cuff abnormalities, but "there was focal sonopalpation tenderness overlaying the teres minor tendon over the anatomical neck.  There seem to be an irregularity at the anatomical neck." (*Id*.)  It was noted that the injection provided complete resolution of petitioner's symptoms.  (*Id*.)  Dr. Bodor concluded that petitioner had been experiencing SIRVA.  (*Id*. at 7.)

### b.  Petitioner's Statements

In his first statement, petitioner described the circumstances of his December 23, 2019 Tdap vaccination, which he indicated was administered in his left (non-dominant) arm.  (Ex. 1, p. 1.)  He denied having any prior joint or muscle problems or any prior injury or trauma to his left shoulder.  (*Id*.)  He indicated that "I was a healthy individual who enjoyed exercising seven days a week and living an active and healthy lifestyle." (*Id*.)  Petitioner felt his vaccination was administered higher than normal but did not otherwise recall experiencing anything unusual at the time of the vaccination.  (*Id*. at 2.)  He states that he began experiencing some shoulder pain about four hours post-vaccination; however, he believed it to be normal post-vaccination pain.  (*Id*.)  He also experienced diaphoresis, nausea, migraine, and fever, which prompted his December 24, 2019 call to the urgent care clinic.  (*Id*.)  The post-vaccination shoulder pain worsened significantly within 24 hours of his vaccination and by Christmas he felt it was "unbearable" and he began to lose range of motion.  (*Id*.)  The remainder of this statement recounts what is otherwise reflected in petitioner's medical records.

In a second statement, petitioner recounts:

Concerning the cessation of my physical therapy in June 2020, I did not stop attending sessions because my issues had been fully resolved. Rather, I stopped due to two main reasons: firstly, after attending six physical therapy sessions, I experienced no improvement in my symptoms. The sessions were painful, time-consuming, and seemed futile as my symptoms remained unchanged.  Secondly, these sessions took place during the Covid-19 pandemic, and I concluded that, given the lack of progress, it was not worth risking exposure to a potentially life-threatening virus.

8

(Ex. 25, p. 1.)

Petitioner also noted that as an actor he takes pride in his physique, which is why the impact of his injury on his work out routine caused increased anxiety and depression.  (Ex. 25, p. 2.)  Additionally, he clarified that "I never participated in professional or college sports.  I only played football through about the tenth grade, and that was it."  (*Id.*)

### IV.  Expert Reports

#### a.  Respondent's Expert, Orthopedist Julie Bishop, M.D.[7]

Dr. Bishop does not agree that petitioner suffered onset of his shoulder symptoms within four hours of his vaccination, because shoulder pain was not referenced in his December 24, 2019 call regarding his antibiotic reaction, though Dr. Bishop stresses it was never confirmed that petitioner suffered an adverse reaction to his antibiotic.[8]  (Ex. B, p. 7.)  Further, Dr. Bishop suggests that the fact that petitioner waited three weeks from the date of his initial primary care appointment until he presented for his recommended x-ray "is unusual as the typical concerned patient would present immediately for radiographs if it was recommended."[9]  (*Id.*)

---

[7] Dr. Bishop serves as a professor in the department of Orthopaedic Surgery at the Ohio State University, Wexner Medical Center, as well as Chief of the Division of Shoulder surgery, and Vice Chair of Finance for the Orthopaedic Department.  (Ex. A, p. 1-2, 7.)  As a shoulder specialist, all of Dr. Bishop's research interests, publications, book chapters, and presentations have been on the treatment of shoulder pathology.  (*Id.* at 9-41.)  Dr. Bishop has treated multiple patients with SIRVA in her practice over the years and has published in this area as well.  (Ex. B, p. 1.)  Dr. Bishop received her medical degree from Cornell University Medical College in 1997.  (Ex. A, p. 1.)  She completed fellow training in 2003 specifically in shoulder surgery (fellowship at Mount Sinai Hospital in New York City) and Orthopaedic sports medicine (visiting fellowship at the University of Pittsburg Medical Center).  (*Id.*)  She is board certified in orthopedic surgery.  (*Id.* at. 2.)  Dr. Bishop is also a fellow of the American Academy of Orthopaedic Surgeons, an active member of the American Shoulder and Elbow Surgeons, a member of the American Orthopaedic Society for Sports Medicine as well as an elected member of the American Orthopaedic Association.  (*Id.* at 9.)

[8] Discussing petitioner's later physical therapy encounters during which he characterized this reaction as an allergic reaction to the vaccine, Dr. Bishop stresses that there is no literature supporting that assertion.  (Ex. B, p. 8.)  Thus, she indicates that "this is a connection/correlation that has only been made by the petitioner."  (*Id.*)  However, both petitioner's statements and medical records are sufficiently clear in distinguishing petitioner's initial systemic complaints from his shoulder complaints as two separate issues.  Therefore, it is not necessary to resolve whether petitioner's systemic symptoms were related to his vaccine, his antibiotics, or some other unknown cause.

[9] To the extent Dr. Bishop appears to raise this as a reason to be skeptical of the credibility of petitioner's subjective complaints, it is not persuasive.  Nothing in the record indicates why petitioner's x-ray study was done on January 21, 2020.  However, it is apparent from the medical records that petitioner went to a different facility for the x-rays (Renaissance Imaging Centers vs. Burns Medical Group).  (Ex. 6, p. 14.)  There is no basis for assuming that an immediate appointment would have been available to petitioner or that petitioner didn't select the earliest practicable appointment.  Moreover, the record of petitioner's January 3, 2020 encounter confirms he was instructed to follow up in two weeks.  (*Id.* at 13.)  Accordingly, petitioner would have been aware that "immediate" x-rays were not necessary.  Considering the record as a whole, I cannot agree that there is anything suspect in the timing of petitioner's initial x-ray imaging.

By Dr. Bishop's interpretation of the medical records, neither petitioner's first orthopedist, Dr. Yacoubian, nor his physical therapist, accepted that petitioner was suffering any vaccine-related shoulder pain.  (Ex. B, pp. 7-8.)  Instead, she opines that it was appropriate, following recommendations of the American Academy of Orthopaedic Surgeons (AAOS), for Dr. Yacoubian to acknowledge that onset of petitioner's shoulder pain started after vaccination, but to explain that current evidence does not support vaccine causation of common shoulder pathologies.  (*Id*. at 8.)  She further stresses that the physical therapist expressed that a SIRVA was unlikely in favor of biopsychosocial contributing factors.[10]  (*Id*.)  Dr. Bishop stresses that petitioner's x-rays were negative, and she interprets his MRI as having findings "consistent with the potential sequela of shoulder instability."  (*Id*. at 7.)  She states that "this is not uncommon for a prior football player with a very active workout/gym reported history."  (*Id*.)  She also stresses the absence of findings of bursitis, rotator cuff edema, adhesive capsulitis, or lytic lesions of the bone, which would be expected in SIRVA.  (*Id*.)  Thus, Dr. Bishop opines the MRI findings are more consistent with a history of athletic injury rather than acute inflammation due to vaccine reaction.  (*Id*. at 8.)

Dr. Bishop further opines that petitioner's injury likely resolved after physical therapy:

> [T]he petitioner then no-shows for any further PT sessions and seeks no treatment for his shoulder until 7 months later, and therefore, it is reasonable to conclude, his shoulder pain resolved, and ultimately conservative treatment resolves his complaints.  Typically, in the medical field, if a patient no-shows for further PT sessions it is either due to 1) the condition being resolved and no need to go back or 2) they are not getting better and thus they return to their physician for further treatment

---

[10] Later in her report, Dr. Bishop discusses petitioner's psychology encounter during which he expressed that his physicians were "ignoring/not acknowledging" that his shoulder problems were related to his vaccination.  (Ex. B, p. 9.)  Dr. Bishop states that "the tone of this visit is very concerning" and that it is "clearly a mischaracterization of what truly occurred as his physician and the PT clearly acknowledged his concerns about the vaccine and provided him with appropriate treatment."  (*Id*.)  Dr. Bishop goes on to note that Dr. Bodor subsequently documented petitioner's complaint that his prior orthopedist "refused to acknowledge that his injury was related to the vaccine."  (*Id*.)  She states that "this is the perception of the petitioner, claiming he was not helped appropriately by other health care providers, when the records clearly indicate this was not the case."  (*Id*.)  Again, Dr. Bishop expresses skepticism regarding petitioner's credibility within his treatment history that is not persuasive.  (*See* also n. 9, *supra*.)  It is not clear how Dr. Bishop squares this criticism of petitioner with her own assessment of the medical records from which she opines that, though they purported to validate his concerns, both Dr. Yacoubian and the physical therapist told petitioner his condition was not vaccine related.  Whether the care petitioner received was medically appropriate for the pathology he suffered is irrelevant to whether he subjectively felt heard by his treaters as to the cause of his condition.  And, regardless of whether Dr. Bishop agrees with petitioner's course of care, she cites evidence from the medical records to confirm the basis for petitioner's subjective experience of his prior medical treatment.  In any event, as a layperson, petitioner cannot be faulted for suspecting his prior medical care had been lacking when he felt he remained symptomatic despite that care.  Patients often seek second opinions for precisely this reason.

recommendations.  Given that the petitioner did not return to any physician for further treatment, one can again reasonably conclude, his symptoms resolved.

(Ex. B, p. 8.)

Regarding petitioner's subsequent treatment with Dr. Bodor, Dr. Bishop agrees that the Tenex procedure recommended by Dr. Bodor, though "relatively new," "is an accepted technique to address chronic tendinopathies," though much less commonly for shoulder tendons.  (Ex. B, p. 9.)  Dr. Bishop asserts it should be viewed as an experimental treatment for SIRVA and should not be viewed as confirmatory of diagnosis.  (*Id*.)  Dr. Bishop indicates that Dr. Bodor's actual surgical report does not indicate he did any actual aspiration of a vaccine deposit and that his prior experience with 9 patients is anecdotal.  (*Id.*)  Dr. Bishop stresses the limited value of case reports.  (*Id*.)

Dr. Bishop indicates that petitioner's first encounter with Dr. Bodor did not include any tenderness to palpation and petitioner had full range of motion at that time.  (Ex. B, p. 11.)  It was only upon his return that petitioner was noted to have tenderness over the teres minor and pain with cross chest abduction, which is also not consistent with his prior treatment history.  (*Id*.)  Dr. Bishop also indicates that Dr. Bodor's interpretation of petitioner's MRI changed from one visit to the next.  (*Id*.)  Thus, Dr. Bishop questions whether petitioner's history is actually consistent with Dr. Bodor's prior experience using Tenex to treat the shoulder and further suggests that the findings Dr. Bodor observed were new and unrelated findings.  (*Id*.)

In sum, Dr. Bishop opines:

There is significant evidence from the MRI that petitioner had many other abnormalities in his shoulder clearly related to wear and tear and a very likely history of anterior shoulder instability, that would explain his symptoms and therefore, SIRVA is not the only plausible diagnosis for his symptomology.  The most consistent physical examination finding prior to the petitioner seeing Dr. Bodor was a positive impingement sign noted several times in the records, which can be seen with a "low-grade" partial articular supraspinatus tear.  Low-grade is a very mild, slight tear and nothing on the MRI was consistent with any acute inflammatory reaction to a vaccination.

Therefore, I conclude with a reasonable degree of medical certainty that there is no objective evidence or documentation to support the shoulder symptoms of [petitioner] were caused by his tetanus vaccination on 12/23/2019.  There is insufficient support for this in the records and there is instead evidence to support that his left shoulder findings were more likely than not, due to chronic, degenerative, wear and tear types of pathology that can be seen in a former football player and avid athlete.

(*Id*. at 12-13.)

### b.  Petitioner's Expert, Orthopedist Marko Bodor, M.D.[11]

In his report, Dr. Bodor largely focuses on the success of the treatment he administered to petitioner.  He asserts that petitioner's response to this particular treatment is consistent with a case series that he asserts provides proof of concept evidence that for SIRVA cases involving the teres minor and infraspinatus tendon insertions. (Ex. 32, pp. 2-3.)  Dr. Bodor opines that, even if a Hill-Sach deformity was present, it would not explain the edema he observed in the teres minor tendon and would not respond to the ultrasonic aspiration and debridement procedure her successfully performed on petitioner.  (*Id*. at 3.)  Dr. Bodor suggests that it is reasonable that he was the first to detect the teres minor abnormality upon ultrasound.  (*Id*.)  He indicates that ultrasound is more sensitive to the type of cortical abnormality he observed on the teres minor and the abnormality is small enough to have potentially been overlooked by the radiologist.  (*Id*.)  Dr. Bodor opines that petitioner "sustained a classic SIRVA injury with no history of prior shoulder problems, onset of pain within 48 hours, symptoms for more than 6 months, concordant physical examination and MRI findings, and fortunately near-complete resolution of his pain and disability following treatment tarted to the areas of his disease."  (*Id*.)

## V.    Discussion

Petitioner argues that he is entitled to compensation for his shoulder injury, either as a Table SIRVA or on the basis of a shoulder injury caused-in-fact by his vaccination. (ECF No. 50, pp. 7-13; *see also* ECF No. 32, pp. 22-38.)  Respondent disputes as a threshold matter that petitioner has met the statutory severity requirement under the Vaccine Act.  (ECF No. 51, pp. 7-11; *see also* ECF No. 29, pp. 7-9; ECF No. 38, pp. 7-11.)  Regarding a Table SIRVA, respondent contends that petitioner's injury is explained by prior shoulder dysfunction that predated his vaccination, implicating the first and fourth of the SIRVA QAI criteria.  (ECF No. 51, pp. 9-11; *see also* ECF No. 32, pp. 8-9; ECF No. 38, pp. 8-11.)  Respondent also dispute that petitioner has demonstrated causation-in-fact.  (ECF No. 51, pp. 11-14; see also ECF No. 32, pp. 38-41; ECF No. 38, pp. 11-13.)  Because I have concluded that petitioner has demonstrated the presence of a Table SIRVA, it is not necessary to address the parties' arguments with respect to causation-in-fact.

---

[11] Dr. Bodor received his medical degree from the University of Cincinnati in 1987 and completed a surgery internship at the University of California, San Diego, in 1988. (Ex. 18, p. 1.)  He completed his physical medicine and rehabilitation residency at the University of Michigan in 1993.  (*Id*.)  Along with three fellows, he sees approximately 28 patients per day, where he performs diagnostic and therapeutic procedures.  (*Id*. at 2.)  Dr. Bodor is affiliated with the UCSF Department of Neurological Surgery and the UC Davis Department of Physical Medicine and Rehabilitation, collaborating in the care of patients and teaching visiting faculty, fellows, residents, medical and pre-medical students.  (*Id*.)  He also serves as the medical director of the Napa Medical Research Foundation, spending approximately 10-20 hours per week supervising research assistants and PhD students.  (*Id*.)

### a. Severity Requirement

In order to state a claim for a vaccine-related injury under the Vaccine Act, a vaccinee must have either:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

§ 300aa-11(c)(1)(D); *see also Black v. Sec'y of Health & Human Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a prima facie case, but clear a jurisdictional threshold, by "submit[ting] supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted).  In this case, only the first of these conditions is potentially met.[12]

The Vaccine Act prohibits a special master from ruling for petitioner based solely on his allegations unsubstantiated by medical records or medical opinion.  § 300aa-13(a)(1).  However, "the function of a special master is not to 'diagnose' vaccine-related injuries, but instead to determine 'based on the record evidence as a whole and the totality of the case,'" whether causation has been demonstrated.  *Andreu ex rel. Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009) (quoting *Knudsen ex rel. Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994)).  Special masters are not bound by the reports, summaries, or conclusions contained in the medical records.  § 300aa-13(b)(1).  Rather, the special master must consider the entire record.  *Id.*

---

[12] Neither "residual effects" nor "complication" is defined within the Vaccine Act itself.  *See* § 300aa-33.  However, in *Wright v. Secretary of Health & Human Services*, the Federal Circuit described these terms as follows: "'Residual' suggests something remaining or left behind from a vaccine injury.  An effect that is 'residual' or 'left behind' is one that never goes away or that recurs after the original illness."  22 F.4th 999, 1005 (Fed. Cir. 2022) (internal citation omitted).  A "complication," however, is a "morbid process or event occurring during a disease which is not an essential part of the disease, although it may result from it."  *Id.* at 1006. (internal citation omitted).

> Read together, "residual effects" and "complications" appear to both refer to conditions within the patient, with "residual effects" focused on lingering signs, symptoms, or sequalae characteristic of the course of the original vaccine injury, and "complications" encompassing conditions that may not be "essential part[s] of the disease" or may be outside the ordinary progression of the vaccine injury.

*Id.* (alteration in original).  Because the complication or residual effect must be "of such illness, disability, injury, or condition," the traditional tort concepts of causation apply, and the vaccine injury must be both a but-for cause and substantial contributing factor to the complication or residual effects at issue.  *Id.* at 1004-05.

A petitioner must prove by a preponderance of the evidence the factual circumstances surrounding his claim.  *See* § 300aa-13(a)(1)(A).  However, not every element of petitioner's claim needs to be specifically supported by medical records or opinion.  For example, onset of an injury may be determined to be consistent with the Vaccine Injury Table even when the first symptom or manifestation "was not recorded or was incorrectly recorded as having occurred outside such period."  § 300aa-13(b)(2).  The fact of a vaccination also need not itself be proven by medical records or medical opinion.  *See, e.g., Wonish ex rel. Wonish v. Sec'y of Health & Human Servs.*, No. 90-667V, 1991 WL 83959, at *4 (Cl. Ct. Spec. Mstr. May 6, 1991) (stating, with regard to § 300aa-13(a)(1), that "it seems obvious then that not all elements must be established by medical evidence" and that "[v]accination is an event that in ordinary litigation could be established by lay testimony" as "[m]edical expertise is not typically required"); *Centmehaiey v. Sec'y of Health & Human Servs.*, 32 Fed. Cl. 612, 621 (1995) (noting that the "lack of contemporaneous, documentary proof of vaccination, however, does not necessarily bar recovery", *aff'd*, 73 F.3d 381 (Fed. Cir. 1995).  The Federal Circuit has also observed, albeit in the context of attorneys' fees and costs, that

> [w]hile lay opinions as to causation or medical diagnosis may be properly characterized as mere "subjective belief" when the witness is not competent to testify on those subjects, the same is not true for sworn testimony as to facts within the witness's personal knowledge, such as the receipt of a vaccine and the timing and severity of symptoms.

*James-Cornelius ex rel. E.J. v. Sec'y of Health & Human Servs.*, 984 F.3d 1374, 1380 (Fed. Cir. 2021).

However, medical records do ordinarily "warrant consideration as trustworthy evidence."  *Cucuras ex rel. Cucuras v. Sec'y of Health & Human Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993).  Thus, where subsequent testimony conflicts with contemporaneous medical records, special masters frequently accord more weight to the medical records.  *See, e.g.*, *Reusser ex rel. Reusser v. Sec'y of Health & Human Servs.,* 28 Fed. Cl. 516, 523 (1993) ("written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later"); *see also Vergara ex rel. J.A.V. v. Sec'y of Health & Human Servs.*, No. 08-882V, 2014 WL 2795491, *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recounted in later medical histories, affidavits, or trial testimony.").

Special masters are cautioned against favoring contemporaneous records "reflexively" and must not overemphasize individual records at the expense of a comprehensive evaluation of the entire record.  *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 539-41 (2011).  "[M]edical records are only as accurate as the person providing the information."  *Parcells ex rel. Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006).  Moreover, "the absence of a reference to a condition or circumstance is much less

significant than a reference which negates the existence of the condition or circumstance." *Murphy ex rel. Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991) (quoting *Murphy ex rel. Murphy v. Sec'y of Health & Human Servs.,* No. 90-882V, 1991 WL 74931, at *4 (Cl. Ct. Spec. Mstr. Apr. 25, 1991)), *aff'd*, 968 F.2d 1226 (Fed. Cir.), *cert. denied*, *Murphy v. Sullivan*, 506 U.S. 974 (1992).

In *Kirby v. Secretary of Health & Human Services*, the Federal Circuit confirmed that it is not an error for a special master to find the severity requirement met where that finding is based on a collection of "plausible evidence."  997 F.3d 1378, 1381 (Fed. Cir. 2021).  In that case, petitioner's medical records reflected active treatment of her condition for only a few months before she was released as having reached maximum medical improvement, though not entirely symptom free.  *Id.* at 1380.  Thereafter, the medical records were silent as to her alleged residual effects for the remaining duration of the six-month post-vaccination period.  *Id.*  However, petitioner testified that she continued a home exercise plan for more than a year.  *Id.* at 1381.  Her testimony was corroborated by documentation in the form of her retained home exercise sheet, a more remote return visit where the relevant symptoms were again reported, and an expert opinion confirming her reported symptoms were consistent with her injury.  *Id*.  The Federal Circuit concluded that where the medical records are silent, rather than contradictory, it was not error for the special master to credit the petitioner's corroborated testimony as evidence satisfying the six-month severity requirement.  *Id*. at 1384.

Here, the medical records are clear.  Petitioner began treatment for his alleged shoulder condition on January 3, 2020, approximately 11 days post-vaccination.  (Ex. 6, pp. 12-13.)  Thereafter, he continued seeking regular treatment until June 2, 2020, approximately five months and ten days post-vaccination.  (Ex. 9, p. 14.)  At that time, petitioner was still symptomatic and further physical therapy was anticipated; however, he began to "no show" for his physical therapy appointments.  (*Id.* at 16.)  After that, there is an undisputed seven-month gap in petitioner's treatment records.  However, when petitioner returned to care, he provided histories indicating that his symptoms had persisted.  (Ex. 10, p. 2; Ex. 11, p. 3.)  Ultimately, Dr. Bodor's physical examination confirmed shoulder impingement (positive Hawkins test), which had been a feature of his condition during his original course of treatment.  (*Compare* Ex. 11, pp. 3, 7 *and* Ex. 7, pp. 4, 12.)  In and of itself, a seven-month gap in treatment is not necessarily informative of whether a SIRVA or SIRVA-like injury persisted.  For example, in *Ratzlaff v. Secretary of Health & Human Services*, I awarded damages to a SIRVA petitioner who had several extended gaps in her treatment history, including an 11-month gap, a 16-month gap, a 13-month gap, and a six-month gap.  18-1017V, 2023 WL 4072909 (Fed. Cl. Spec. Mstr. May 24, 2023).  While the parties disputed the significance of the treatment gaps vis-à-vis the severity of the petitioner's ongoing symptoms, it was undisputed that the petitioner had an overall six-year history of symptoms sequela to her SIRVA.  *Id*. at *7.

Nonetheless, respondent raises three points of concern.  First, respondent contends that petitioner's premature departure from physical therapy implies his injury

had resolved.  (ECF No. 51, pp. 7-8; Ex. B, p. 8.)  Second, respondent contends that petitioner's subsequent medical records should be given less weight because he resumed treatment after he filed his petition for compensation.  (ECF No. 51, pp. 8-9 (citing *Kohl v. Sec'y of Health & Human Servs*., No. 16-748V, 2022 WL 4127217, at *24 (Fed Cl. Spec. Mstr. Aug. 18, 2022); *Gerami v. Sec'y of Health & Human Servs*., No. 12-442V, 2013 WL 5998109, at *4 (Fed Cl. Spec. Mstr. Oct. 11, 2013), *mot. rev. den'd*, 127 Fed. Cl. 299 (2014); *Goodgame v. Sec'y of Health & Human Servs*., 157 Fed. Cl. 62 (2021)).)  And, third, respondent contends through his expert that the physical findings included in his medical records following the 7-month gap in treatment are not supportive of SIRVA.  (*Id*. at 8.)

Respondent's suggestion that petitioner discontinued physical therapy because his condition had resolved is speculative and not well supported by the record of this case.  It is clear from petitioner's final physical therapy encounter, which was just about 20 days shy of the six-month mark, that he was still symptomatic (Ex. 9, p. 14) and nothing in any of the medical records suggests he had recovered.  Respondent's own expert identifies two primary reasons a person will discontinue physical therapy – either the patient feels the condition resolved and further physical therapy is not needed or the patient feels the physical therapy is not helping and they feel the need for further evaluation.  (Ex. B, p. 8.)  While Dr. Bishop assesses the former to be a more likely explanation in this case, this conclusion is inseparable from her broader skepticism of petitioner's treatment history that I do not find persuasive.  (*See* n. 9, 10, *supra*.)  In effect, Dr. Bishop opines that petitioner was not frustrated by his treatment because, in her view, he should not have been frustrated by his treatment.  (*See* n. 10, *supra*.)  However, this conclusion is directly contradicted by petitioner's subsequent psychology encounter in which he explicitly explained that he had been frustrated with his prior treatment.  (Ex. 10, p. 2.)  Furthermore, neither Dr. Bishop's report nor respondent's motion response acknowledges that petitioner's gap in treatment correlates to the rise of the Covid-19 pandemic.  (Ex. B; ECF No. 51.)  Petitioner has provided a sworn statement specifically indicating that the pandemic factored into his decision regarding ongoing treatment.  (Ex. 25, p. 1.)  I find this explanation to be facially reasonable and compatible with the medical records.  Moreover, respondent has offered no specific challenge to it.

Regarding respondent's second point, it must be stressed that each of the cases cited by respondent supports the proposition that medical encounters specifically arranged for purposes of litigation are entitled to less weight.  *Kohl*, 2022 WL 4127217, at *24 (discussing a medical record that stated "[n]eeds a statement for her attorney . . ."); *Gerami v. Sec'y of Health & Human Servs*., No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (discussing a treating physician opinion letter filed after petitioner was ordered to file medical records); *Goodgame*, 157 Fed. Cl. at 70 (discussing a medical record "arranged 'at the recommendation of her lawyer.'")  It is not the case that bona fide treatment records receive less weight simply by virtue of having been created after the petition was filed.  When an ongoing treatment relationship is present, such medical records still contain "information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With

proper treating hanging in the balance, accuracy has an extra premium." *Cucuras*, 993 F.2d at 1528.  In this case, even granting that Dr. Bodor's dual role as treating physician and expert has the potential to blur these distinctions within the most recent records, respondent has not come forward with any reason – apart from timing – to suspect that petitioner's telehealth psychology encounter was for purposes of litigation.  Although the medical record does state that petitioner "is now going to see a lawyer and look into what he went though/his situation," this is referenced only as part of petitioner's overall history, not as any indication of the purpose of the encounter.  (Ex. 10, p. 2.) Petitioner's medical record supports that his ongoing shoulder symptoms and frustration with what he viewed as ineffective prior treatment were the underlying foundation for the anxiety and depression he was seeking to treat at that time.  (*Id.* at 2-3.)

Additionally, Dr. Bodor's subsequent medical records confirm on physical examination that petitioner presented with full, but painful, range of motion and signs of impingement.  (Ex. 11, pp. 3, 7.)  Dr. Bishop raises a concern that the findings of tenderness over the teres minor and pain with cross chest abduction that informed Dr. Bodor's specific use of Tenex treatment in March of 2021 were not present at his earlier January encounter.  (Ex. B, p. 11.)  However, she agrees that "a positive impingement sign [was] noted several times in the records." (*Id.* at 12.)  Thus, it is not necessary to resolve whether the additional findings of teres minor tenderness and cross abduction pain were sequela to petitioner's original injury or whether the resulting Tenex treatment is supportive of Dr. Bodor's opinion.  Dr. Bishop has not called into question that painful range of motion and signs of impingement are consistent with petitioner's prior history and consistent with sequela of SIRVA.

For all of these reasons, I find that there is preponderant evidence that symptoms attributable to petitioner's post-vaccination shoulder injury persisted for at least six months.  This conclusion does not turn on the significance (if any) of Dr. Bodor's use of a Tenex treatment.

### b.  Table SIRVA

#### i.  QAI criteria (ii) and (iii) are undisputed

In his motion, petitioner asserts that onset of his alleged shoulder pain arose within 48 hours of his vaccination, as required by the second SIRVA QAI criterion, and that his pain and reduced range of motion were limited to his affected shoulder, as required by the third SIRVA QAI criterion.  (ECF No. 32, pp. 25-30.)  In his Rule 4 Report and two motion responses, respondent has only ever challenged petitioner's Table SIRVA allegation based on QAI criteria (i) and (iv), which are discussed below. (ECF No. 29, pp. 8-9; ECF No. 38, pp. 8-11; ECF No. 51, pp. 9-11.)  Thus, petitioner's satisfaction of the second and third SIRVA criteria is undisputed.

I do note, however, that Dr. Bishop herself disputed that onset of petitioner's shoulder pain arose within 48 hours of vaccination.  (Ex. B, p. 12.)  However, I do not find Dr. Bishop's reasoning to be persuasive.  Dr. Bishop focuses merely on the fact that

petitioner did not report shoulder pain when, about 24 hours post-vaccination, he reported a broader reaction that was attributed to his antibiotic.  (*Id*.)  Considering the records as a whole, the treatment records for the shoulder condition provide preponderant evidence of onset of shoulder pain within 48 hours of vaccination.  Dr. Bishop also appears to dispute that petitioner met the third SIRVA criterion because he did not have reduced range of motion (*Id*.); however, she indicates only that he never lost passive range of motion (*Id*).  The physical therapy evaluation confirmed that he did have impaired active range of motion.  (Ex. 9, p. 3.)  There has been no suggestion that his pain and reduced range of motion were not limited to the affected shoulder.

Based on the record as a whole, I find that petitioner has satisfied the second and third SIRVA criteria by preponderant evidence.

ii.  <u>QAI criteria (i) and (iv)</u>

Under the first SIRVA QAI criterion, petitioner must show that there is "[n]o history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain [his] alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection."  42 C.F.R. 100.3(c)(10).  Additionally, under the fourth criterion, he must show that "[n]o other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)."  *Id*.  In this case the first and fourth SIRVA criteria are best addressed together, because respondent offers one argument that implicates both criteria.  That is, respondent argues that, despite first experiencing left shoulder symptoms subsequent to vaccination, petitioner's shoulder symptoms are explained by findings consistent with a longstanding prior shoulder dysfunction.  (ECF No. 29, p. 9; ECF No. 38, pp. 9-10; ECF No. 51, p. 10.)  Thus, respondent's contentions with respect to the first and fourth criteria rise or fall together.

Respondent's expert opines (1) that petitioner's cortical deformity in the humeral head on MRI is consistent with a "Hill-Sachs deformity" which is indicative of a prior shoulder dislocation, (2) that petitioner had other MRI findings consistent with degenerative changes, and (3) that petitioner did not have any of the classic findings associated with SIRVA.  (Ex. B, pp. 3, 7-8.)  Thus, combined with a reported history of athletic activity, including football, she opines "with a reasonable degree of medical certainty that there is no objective evidence or documentation to support the shoulder symptoms of Mr. Burroughs were caused by his tetanus vaccination on 12/23/2019.[13]

---

[13] To be clear, Dr. Bishop misstates petitioner's burden of proof to the extent that she implies petitioner has a burden of demonstrating that his tetanus vaccine caused his symptoms.  Under the Vaccine Injury Table, petitioner is entitled to a presumption of vaccine causation.  § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).  Pertinent to this discussion, petitioner's burden of proof under the fourth SIRVA criterion is to demonstrate either (a) that his history is entirely free of the alternative condition at issue or (b) if not, that the condition would not explain his symptoms.  42 C.F.R. 100.3(c)(10)(iv); *Durham v. Sec'y of Health & Human Servs*., No. 17-1899V, 2023 WL 3196229, at *14 (Fed. Cl. Spec. Mstr. May 2, 2023).

(*Id.* at 12.)  There is insufficient support for this in the records and there is instead evidence to support that his left shoulder findings were more likely than not, due to chronic, degenerative, wear and tear types of pathology that can be seen in a former football player and avid athlete."  (*Id.* at 12-13.)

Importantly, however, although SIRVA criterion four requires the petitioner to show that "[n]o other condition or abnormality" would explain petitioner's symptoms, SIRVA itself is not limited to any specific finding or diagnosis.  The QAI definition of SIRVA was specifically drafted to encompass unspecified musculoskeletal shoulder dysfunction.  The proposed rulemaking explained that it was intended to capture "several diagnoses, beyond deltoid bursitis, that resulted in shoulder pain following vaccination, including tendonitis, impingement syndrome, frozen shoulder syndrome, and adhesive capsulitis."  National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, 80 Fed. Reg. 45132-01 (proposed July 29, 2015) (to be codified at 42 CFR pt. 100).  In that regard, the QAI defines SIRVA broadly as "an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.)."  42 C.F.R. 100.3(c)(10).  Thus, SIRVA is in effect a clinical syndrome and petitioner does not bear any burden to demonstrate a specific diagnosis or MRI finding that would support its presence.  Therefore, when respondent contends that intrinsic shoulder pathology constitutes a condition that would otherwise explain petitioner's symptoms, "the question raised by respondent's argument is whether petitioner's own clinical history indicates that [his] shoulder pathology wholly explains [his] symptoms independent of vaccination."  *Lang v. Sec'y of Health & Human Servs.*, No. 17-995V, 2020 WL 7873272, at *13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020); *see also Quantie v. Sec'y of Health & Human Servs.*, No. 18-610V, 2023 WL 2234271, at *20 (Fed. Cl. Spec. Mstr. Feb. 27, 2023) (observing that "[t]he findings on petitioner's MRI are not indicative of 'whether any other condition could explain petitioner's symptoms' . . .")

It must be noted that it is very common for SIRVA petitioners to have findings on an MRI that are potentially consistent with preexisting degenerative changes.  For example, petitioner has filed a review conducted by the Department of Health and Human Services and Centers for Disease Control wherein 476 conceded SIRVA claims were examined for their clinical features.  (Elizabeth M. Hesse et al., *Shoulder Injury Related to Vaccine Administration (SIRVA): Petitioner Claims to the National Injury Compensation Program, 2010-2016*, 38 VACCINE 1076 (2020) (Ex. 27).)  They observed degenerative changes, including rotator cuff degeneration and/or tendinopathy and acromioclavicular arthritis, in a significant number of SIRVA claimants.  (*Id.* at 5 (Table 5).)  Among these compensated claims, 16.2% had evidence on MRI of acromioclavicular arthritis, a further 16.2% had labral tears, and over 40% had either complete or partial rotator cuff tears.  (*Id.*)

Moreover, Atanasoff, et al., which was specifically cited in the proposed rulemaking for SIRVA, accounts for post-vaccination aggravation of preexisting shoulder dysfunction as a potential explanation for at least some SIRVA cases.  Consistent with Dr. Yacoubian's suggestion that the vaccination could have contributed to petitioner's rotator cuff issues (Ex. 7, p. 11), Atanasoff, et al., state:

In general, chronic shoulder pain with or without reduced shoulder joint function can be caused by a number of common conditions including impingement syndrome, rotator cuff tear, biceps tendonitis, osteoarthritis and adhesive capsulitis.  In many cases, these conditions may cause no symptoms until provoked by trauma or other events.  Reilly et al., reviewed a series of shoulder ultrasound and MRI studies obtained in asymptomatic persons past middle age and found partial or complete rotator cuff tears in 39% of those individuals.  Therefore, some of the MRI finding in our case series, such as rotator cuff tears, may have been present prior to vaccination and became symptomatic as a result of vaccination-associated synovial inflammation.

(S. Atanasoff et al., *Shoulder Injury Related to Vaccine Administration (SIRVA)*, 28 VACCINE 8049, 8051 (2010) (Ex. 20, p. 3).)

Thus, respondent's argument against a Table SIRVA ultimately turns not merely on whether petitioner had any degenerative changes on MRI, but on whether Dr. Bishop is persuasive in correlating petitioner's symptoms to a Hill-Sachs deformity that would otherwise point to a prior shoulder dislocation as the source of his symptoms regardless of vaccination.

Petitioner's medical records do not clearly support Dr. Bishop's opinion regarding a prior shoulder dislocation.  Dr. Bishop opines that a shoulder dislocation is likely because "a Hill-Sachs [] is something that *only* occurs from shoulder instability/dislocations/or subluxations."  (Ex. B, p. 11 (emphasis original).)  However, petitioner's MRI was equivocal in noting a cortical deformity with marrow contusion on the humeral head that was "worrisome" for a Hill-Sachs deformity and recommended clinical correlation for a "possible history of anterior dislocation of the shoulder."  (Ex. 8, p. 2.)  The MRI report notes the cortical deformity at issue to be "subtle."  (*Id*. at 3.)  Dr. Bishop reviewed only the MRI report and not the underlying imaging.  Accordingly, she has no basis for urging a more definitive conclusion regarding the possible Hill-Sachs deformity.  Moreover, petitioner's treatment records never provided the clinical correlation recommended by the radiologist.  Petitioner returned to his orthopedist on March 18, 2020, specifically to discuss his MRI results.  (Ex. 7, p. 11.)  Dr. Yacoubian noted the evidence of a Hill-Sachs lesion in particular but did not elicit any history of prior shoulder dislocation.  (*Id*.)  Moreover, he also documented that it remained "conceivable" that petitioner's symptoms were caused by his vaccination and assessed impingement with a "history of tetanus injection with lateral pain right shoulder."  (*Id*. at 12.)  Dr. Bishop believes Dr. Yacoubian's record expresses doubt on the whole that petitioner's symptoms were vaccine caused, but regardless, Dr. Yacoubian's record provides no support for the idea that petitioner's symptoms are better explained by any history of shoulder dislocation, instead emphasizing that onset was correlated to the vaccination.

Dr. Bishop also overstates the degree to which the medical records implicate petitioner's athleticism as a cause of his injury.  Based on several notations in the medical records, Dr. Bishop opines that petitioner was an "avid" athlete.  (Ex. B, p. 13.)  However, nothing in the medical records supports this as a cause of petitioner's symptoms.  When petitioner first presented for orthopedic care, Dr. Yacoubian simply recorded as part of petitioner's history that "[t]he patient is very physically active and enjoys going to the gym and working out and keeping in good shape." (Ex. 7, p. 3.)  However, his assessment was nonetheless "left shoulder strain injury, possible injection related injury." (*Id*. at 4.)  And, as explained above, Dr. Yacoubian maintained this assessment even after being prompted by radiology to clinically correlate for a prior dislocated shoulder.  Although petitioner subsequently reported to Dr. Bodor that he had played football, this was accompanied by a notation explicitly confirming that petitioner had no history of injury to the shoulder.  (Ex. 11, p. 3.)  After receiving this history, and reviewing the MRI report, Dr. Bodor suspected that petitioner had suffered SIRVA rather than suffering consequences of an old football injury.  (*Id*. at 4.)  Despite being aware that petitioner enjoyed keeping physically fit, none of his treating physicians opined that either his shoulder symptoms or his MRI findings were caused by his athletic pursuits.  Moreover, as Dr. Bishop acknowledged, the treating physicians repeatedly validated petitioner's concern that the symptoms arose post-vaccination.  (Ex. B, p. 8.)  Without supporting evidence from the medical records, respondent does not cast doubt on petitioner's alleged SIRVA merely by noting that the petitioner enjoys exercise.  *Accord Stiller v. Sec'y of Health & Human Servs.*, No. 20-1841V, 2023 WL 8539387, at *9-11 (Fed. Cl. Spec. Mstr. Nov. 13, 2023).

In sum, petitioner had a distinct onset of shoulder symptoms post-vaccination.  Although his MRI demonstrated some degenerative changes, there is insufficient evidence to conclude that petitioner's clinical course is explained by preexisting shoulder pathology alone and activation of preexisting pathology, including of the rotator cuff, is consistent with the SIRVA concept.  Though petitioner's treating physicians did not reach any firm conclusion regarding the cause of his pain, the resulting medical records show distinct suspicion of a vaccine-related injury and little to no concern of a prior sports injury as respondent has suggested.  The specific MRI finding respondent's expert stressed (a Hill-Sach deformity) was only noted by the radiologist equivocally and that finding was never validated by clinical correlation.  For all of these reasons, petitioner has met SIRVA criteria one and four by preponderant evidence.  In reaching this conclusion, it is not necessary to address the further question of whether Dr. Bodor's use of Tenex and findings relative to the teres minor would further confirm the presence of a SIRVA.

### c.  Factor unrelated to vaccination

Once petitioner has satisfied his own *prima facie* burden, respondent has the opportunity to demonstrate, also by a preponderance of the evidence, that petitioner's injury was nonetheless caused by a factor unrelated to vaccination.  §§ 300aa-13(a)(1)(B), (a)(2); *Deribeaux ex rel. Deribeaux v. Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1367 (Fed. Cir. 2013).  Although respondent argued that preexisting

shoulder pathology was present and would defeat petitioner's Table claim under SIRVA criterion four, he has not explicitly argued that he could meet his own burden of proof to establish that the pathology at issue actually more likely than not caused petitioner's shoulder injury.  And, indeed, for the reasons discussed above, I found that the evidence preponderates *against* such a conclusion.  Thus, even additionally considering respondent's arguments as endorsing factors unrelated to vaccination as the cause of petitioner's injury, those arguments would still fail for all the same reasons discussed above.

## VI.     Conclusion

After weighing the evidence of record within the context of this program, I find by preponderant evidence that petitioner suffered a Table Injury of SIRVA resulting from his December 23, 2019 Tdap vaccination and that the injury persisted for at least six months.  Accordingly, petitioner is entitled to compensation for his SIRVA.  A separate damages order will be issued.

**IT IS SO ORDERED.**

<u>**s/Daniel T. Horner**</u>
Daniel T. Horner
Special Master